649 S.E.2d 294

**Gary JENKINS, Plaintiff Below, Appellant**

v.

**CSX TRANSPORTATION, INC., Defendant Below, Appellee.**

**No. 33179.**

Supreme Court of Appeals of West Virginia.

Submitted April 3, 2007.

Decided May 17, 2007.

Concurring Opinion of Justice Davis May 21, 2007.

Dissenting Opinion of Justice Starcher June 29, 2007.

Robert F. Daley, Sharon A. Gould, Robert Pierce & Associates, P.C., Pittsburgh, PA, for Appellant.

James W. Turner, William H. Harkins, Jr., Huddleston Bolen, L.L.P., Huntington, for Appellee.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Ohio County entered on February 17, 2006. In that order, the court denied the motion of the appellant and plaintiff below, Gary Jenkins, for a new trial in this action filed pursuant to

the Federal Employers' Liability Act (hereinafter "FELA"), 45 U.S.C. § 51, *et seq.*, against the appellee and defendant below, CSX Transportation, Inc.[1] Mr. Jenkins alleged that he suffered a brain injury as a result of exposure to solvents while he was employed by CSX. Mr. Jenkins sought a new trial after the court granted CSX's motion for judgment as a matter of law upon finding that Mr. Jenkins was unable to provide sufficient evidence of causation at trial.

In this appeal, Mr. Jenkins contends that the circuit court abused its discretion by first, limiting and then later, excluding a portion of the testimony of his medical expert. Mr. Jenkins further argues that the circuit court abused its discretion in limiting the testimony of his expert in the field of neuropsychology such that he could not give an opinion as to the cause of Mr. Jenkins' alleged brain injury. Mr. Jenkins seeks a new trial. This Court has before it the petition for appeal, the designated record, and the briefs and argument of counsel. For the reasons set forth below, the final order is affirmed.

## I.

### FACTS

On August 19, 2002, Mr. Jenkins filed suit against CSX, his former employer, alleging that he suffered from a specific medical condition known as toxic encephalopathy[2] as a result of excessive exposure to occupational solvents during his employment.[3] During discovery, Mr. Jenkins named Alan Ducatman, M.D., as his medical causation expert. While Dr. Ducatman was the only medical doctor designated by Mr. Jenkins, he also listed Dr. James Phifer, a neuropsychologist, as an expert witness.

On November 19, 2004, CSX deposed Dr. Ducatman. During the deposition, Dr. Ducatman was asked if he had reviewed any neuropsychological test results from Dr. Phifer. In response, Dr. Ducatman testified that, "I do not recall seeing a report from Dr. Pfeiffer [sic] relating to this patient. It does not mean that I haven't seen one." Having not reviewed Dr. Phifer's report, Dr. Ducatman did not give an opinion with regard to the cause of Mr. Jenkins' brain injury. At the end of the deposition, CSX reserved the right to re-depose Dr. Ducatman in the event that he was provided Dr. Phifer's report to review. However, CSX never reconvened Dr. Ducatman's deposition.

Dr. Ducatman was called to testify at trial on behalf of Mr. Jenkins on June 16, 2005. Dr. Ducatman began his testimony by discussing the general science regarding the connection between exposure to solvents and injuries to the brain. When Dr. Ducatman began to address Mr. Jenkins' specific injury, CSX objected on the grounds that it never had an opportunity to depose Dr. Ducatman after he reviewed Dr. Phifer's report. CSX stated that it had not been informed that Dr. Ducatman had reviewed Dr. Phifer's report

---

1. "Under the Federal Employers' Liability Act, 45 U.S.C. § 51 (1939), *inter alia*, '[e]very common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier[.]' " Syllabus Point 3, *McGraw v. Norfolk & Western Railway Co.*, 201 W.Va. 675, 500 S.E.2d 300 (1997).

2. According to the National Institute of Neurological Disorders and Stroke, which is part of the National Institutes of Health,

   Encephalopathy is a term for any diffuse disease of the brain that alters brain function or structure. Encephalopathy may be caused by infectious agent (bacteria, virus, or prion) metabolic or mitochondrial dysfunction, brain tumor or increased pressure in the skull, prolonged exposure to toxic elements (including solvents, drugs, radiation, paints, industrial chemicals, and certain metals), chronic progressive trauma, poor nutrition, or lack of oxygen or blood flow to the brain. The hallmark of encephalopathy is an altered mental state. Depending on the type and severity of encephalopathy, common neurological symptoms are progressive loss of memory and cognitive ability, subtle personality changes, inability to concentrate, lethargy, and progressive loss of consciousness.

   *See* http://www.ninds.nih.gov/disorders/encephalopathy/encephalopathy.htm.

3. Mr. Jenkins worked for CSX for approximately 37 years. His employment began in 1963 and ended when he retired in October 2000.

and that he was going to rely upon it to give an opinion as to the cause of Mr. Jenkins' injury. The circuit court sustained CSX's objection stating that it was Mr. Jenkins' duty under Rule 26 of the West Virginia Rules of Civil Procedure to file a supplemental disclosure or otherwise notify CSX that Dr. Ducatman had reviewed the report and was available to be deposed. Dr. Ducatman was allowed to continue his testimony but only to the extent that he could form an opinion regarding Mr. Jenkins' injury without any reference to Dr. Phifer's neuropsychological report.

Thereafter, Dr. Ducatman testified that, "At the time I saw Mr. Jenkins, I was convinced he had a memory problem. I was convinced that he had very substantial solvent exposure, and I was convinced he did not have other important risk factors than the solvent exposure." On cross-examination, Dr. Ducatman acknowledged that without the benefit of neuropsychological information, he was unable to "diagnose" Mr. Jenkins with memory loss caused by exposure to solvents during his employment. The circuit court then instructed the jury to disregard Dr. Ducatman's testimony as it related to Mr. Jenkins because he "did not diagnose a causal relationship between Mr. Jenkins' exposure and any memory problem."

The jury then heard testimony from Dr. Phifer who was qualified as an expert in the area of clinical and forensic neuropsychology. Dr. Phifer gave testimony with regard to general causation and solvent injuries to the brain. Thereafter, the circuit court excused the jury and then heard additional testimony from Dr. Phifer regarding Mr. Jenkins.[4] Dr. Phifer opined within a reasonable degree of neuropsychological certainty or probability that Mr. Jenkins' deficits are consistent with toxic encephalopathy as a result of his exposure to solvents during his employment. Dr. Phifer acknowledged though that diagnosis of toxic encephalopathy requires two elements: the medical component and abnormal neuropsychological testing results. As a non-physician, Dr. Phifer stated that he was unable to offer a medical diagnosis of Mr. Jenkins and could only testify about his neuropsychological testing results.

After hearing the testimony, the court concluded that Dr. Phifer's opinion was not sufficient to support a finding of causation especially in light of Dr. Ducatman's testimony that he was unable to make a diagnosis of solvent-induced toxic encephalopathy. Mr. Jenkins offered no additional evidence of causation. CSX then moved for judgment as a matter of law and the court granted the motion. Thereafter, Mr. Jenkins filed a motion for a new trial which was denied in the final order entered on February 17, 2006. This appeal followed.

## II.

### STANDARD OF REVIEW

As set forth above, Mr. Jenkins has appealed the final order of the circuit court which denied him a new trial.[5] This Court has held that,

Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

4. At this point in the proceedings, counsel for CSX had already made a motion for judgment as a matter of law because Dr. Ducatman had previously testified that he could not diagnose Mr. Jenkins with a brain injury caused by exposure to solvents. The court delayed ruling on the motion until Dr. Phifer was called to testify. After Dr. Phifer was qualified as an expert in the area of neuropsychology, the court excused the jury so Dr. Phifer could be questioned to determine whether he was qualified to give an opinion as to the cause of Mr. Jenkins' injury.

5. "Pursuant to 45 U.S.C. § 56 (1948), federal and state courts have concurrent jurisdiction of claims brought under the Federal Employers' Liability Act, 45 U.S.C. § 51 (1939). Although a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the Federal Employers' Liability Act, substantive issues under the Federal Employers' Liability Act are determined by the provisions of the statute and interpretative decisions of the Federal Employers' Liability Act given by the federal courts." Syllabus Point 4, *McGraw, supra.*

Syllabus Point 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). In determining whether the circuit court erred by denying Mr. Jenkins a new trial, we must review certain evidentiary and procedural rulings made by the court. Our standard of review for such rulings was set forth in Syllabus Point 1 of *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995), as follows:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

*See also* Syllabus Point 1, *Bell v. Inland Mut. Ins. Co.*, 175 W.Va. 165, 332 S.E.2d 127 (1985). ("The imposition of sanctions by a circuit court under *W.Va. R. Civ. P.* 37(b) for the failure of a party to obey the court's order to provide or permit discovery is within the sound discretion of the court and will not be disturbed upon appeal unless there has been an abuse of that discretion."); Syllabus Point 5, *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598 (1960) ("Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused."). With these standards in mind, we now consider the parties' arguments.

## III.

## DISCUSSION

■ Mr. Jenkins first contends that the circuit court abused its discretion by not allowing Dr. Ducatman to testify regarding his review of Dr. Phifer's test results. Mr. Jenkins acknowledges that he failed to comply with Rule 26 of the West Virginia Rules of Civil Procedure by not providing CSX with official notification that Dr. Ducatman had reviewed Dr. Phifer's report. Mr. Jenkins contends, however, that the failure to comply with Rule 26 was not intentional or calculated. Mr. Jenkins maintains that CSX should have known from the initial discovery disclosures as well as Dr. Ducatman's testimony during his deposition that he intended to rely on Dr. Phifer's report. Mr. Jenkins notes that this was not the first time Dr. Ducatman had testified at a solvent exposure trial and contends that CSX was well aware that Dr. Ducatman had relied upon neuropsychological data in every other solvent exposure case wherein he had provided an expert opinion. Knowing that CSX had this information, Mr. Jenkins says that he in good faith believed that CSX had simply chosen not to do the follow-up deposition of Dr. Ducatman. Therefore, he argues that the circuit court should have imposed a less harsh sanction in accordance with this Court's decision in *Anderson v. Kunduru*, 215 W.Va. 484, 600 S.E.2d 196 (2004).

In *Anderson*, this Court reversed an order of summary judgment in favor of the defendant which was granted after the plaintiff's standard of care expert was prohibited from testifying because the plaintiff failed to produce the expert's report within the court-ordered time frame. This Court found in *Anderson* that a sanction should have been imposed upon the attorney rather than the client. 215 W.Va. at 489, 600 S.E.2d at 201. Based on *Anderson*, Mr. Jenkins argues that the circuit court should have declared a mistrial in his case and imposed all costs on his attorney. This would have allowed CSX to re-depose Dr. Ducatman prior to a new trial.

In response, CSX contends that the circuit court did not err by prohibiting Dr. Ducatman from relying on Dr. Phifer's test results because Mr. Jenkins failed to supplement his discovery as required by Rule 26(e) of the West Virginia Rules of Civil Procedure. During his deposition, Dr. Ducatman stated that he had never prescribed any neuropsychological testing for Mr. Jenkins and that he did not recall reviewing any test results from Dr. Phifer. CSX acknowledges that Dr. Ducatman has provided expert testimony in other similar solvent exposure cases and relied upon neuropsychological test results in doing so. However, in those cases, Dr. Ducatman

referred the plaintiff for neuropsychological testing. Because he did not refer Mr. Jenkins for such testing and because Mr. Jenkins did not supplement his discovery, CSX says it had no reason to believe that Dr. Ducatman would give a causation opinion at trial.

CSX further argues that Mr. Jenkins' reliance upon *Anderson* is misplaced. In that regard, CSX points out that the report at issue in that case was eventually produced before trial. Here, the fact that Dr. Ducatman intended to rely upon Dr. Phifer's test results was not revealed until he began to testify at trial. In sum, CSX argues the trial court's decision to prohibit Dr. Ducatman from testifying about Dr. Phifer's report was in accordance with the Rules of Civil Procedure which are designed to prevent trial by ambush.

In determining whether the trial court erred by excluding Dr. Ducatman's testimony about Dr. Phifer's report, we first look at the requirements of Rule 26 of the West Virginia Rules of Civil Procedure. Rule 26(b)(4) provides, in pertinent part:

> Trial preparation: experts.—Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

In addition, Rule 26(e) states, in pertinent part:

> *Supplementation of responses.*—A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
>
> (1) A party is under a duty seasonably to supplement that party's response with

respect to any question directly addressed to:

. . . .

> (B) The identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the expert's testimony.

In this case, it is undisputed that Mr. Jenkins failed to comply with Rule 26(e) because he did not notify CSX that Dr. Ducatman had reviewed Dr. Phifer's report and intended to rely upon it to give his opinion at trial regarding the cause of Mr. Jenkins' injury.

■ "Rule 37 of the West Virginia Rules of Civil Procedure is designed to permit the use of sanctions against a party who refuses to comply with the discovery rules, i.e., Rules 26 through 36." Syllabus Point 1, *Shreve v. Warren Assoc., Inc.,* 177 W.Va. 600, 355 S.E.2d 389 (1987). Rule 37(b) provides, in pertinent part:

> (2) Sanctions by court in which action is pending.—If a party or an officer, director, or managing agent of a party or a person designated under Rules 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to supplement as provided for under Rule 26(e), or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others are the following:
>
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismiss-

ing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(E) Where a party has failed to comply with an order under Rule 35(a) requiring that party to produce another for examination, such orders as are listed in subparagraphs (A), (B), and (C) of this paragraph, unless the party failing to comply shows that that party is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

After carefully reviewing the record and considering the parties' arguments, we are unable to find that the circuit court abused its discretion by prohibiting Dr. Ducatman from testifying about Dr. Phifer's report. We have explained that "[u]nder the abuse of discretion standard, we will not disturb a circuit court's decision unless the circuit court makes a clear error of judgment or exceeds the bounds of permissible choices in the circumstances." *Hensley v. West Virginia Dep't of Health and Human Res.*, 203 W.Va. 456, 461, 508 S.E.2d 616, 621 (1998) (*quoting Gribben v. Kirk*, 195 W.Va. 488, 500, 466 S.E.2d 147, 159 (1995)). Given the facts and circumstances in this case, we cannot say that the court made a clear error of judgment. Moreover, the decision to exclude the testimony was certainly within the range of permissible sanctions under Rule 37.

We are not persuaded by Mr. Jenkins' argument that this case is similar to *Anderson.* As noted above, the plaintiff's failure to comply with the discovery rules was evident in *Anderson* prior to trial. Upon review of the record in that case, we concluded that several different sanctions

could have been imposed instead of striking the witness including admonishment and monetary sanctions against the plaintiff's counsel. In the case at bar, Dr. Ducatman was actually on the stand at trial ready to testify when the court learned that there had been a violation of Rule 26. The facts of this case are more on point with those of *Graham v. Wallace*, 214 W.Va. 178, 588 S.E.2d 167 (2003).

In *Graham*, a former patient brought a medical malpractice action against his oral surgeon. At trial, the defendant called Dr. Phillip Hutt to testify as an expert in oral and maxillofacial surgery. Counsel for the defendant elicited testimony from Dr. Hutt about the proper way to perform a certain procedure even though his opinion on this issue had not been previously disclosed to the plaintiff. After the jury returned a verdict in favor of the defendant, the plaintiff sought a new trial on the basis that Dr. Hutt's testimony should have been excluded. Upon appeal, we determined that the plaintiff had been unfairly surprised by Dr. Hutt's testimony. 214 W.Va. at 185, 588 S.E.2d at 174.

In *Graham*, this Court noted that "one of the purposes of the discovery process under our Rules of Civil Procedure is to eliminate surprise. Trial by ambush is not contemplated by the Rules of Civil Procedure." 214 W.Va. at 184, 588 S.E.2d at 173 (*quoting McDougal v. McCammon*, 193 W.Va. 229, 236–37, 455 S.E.2d 788, 795–96 (1995)). We further explained that

[t]he discovery process is the manner in which each party in a dispute learns what evidence the opposing party is planning to present at trial. Each party has a duty to disclose its evidence upon proper inquiry. The discovery rules are based on the belief that each party is more likely to get a fair hearing when it knows beforehand what evidence the other party will present at trial. This allows for each party to respond to the other party's evidence, and it provides the jury with the best opportunity to hear and evaluate all of the relevant evidence, thus increasing the chances of a fair verdict.

214 W.Va. at 184–85, 588 S.E.2d at 173–74.

The transcript of the trial proceedings shows that the court considered other op-

tions before ultimately ruling that Dr. Ducatman could not testify about Dr. Phifer's test results. In that regard, the Court stated:

> If this was going to be a month, month and a half trial, and we were able to do, I would—quite frankly, what I would do is have you redepose Dr. Ducatman at a time convenient to everybody so we can—and I've done that many times during a trial. But they're lengthy trials. We cannot—I just—we don't have the time to do that now and that's unfortunate.

This Court affords broad discretion in the use of sanctions under the Rules of Civil Procedure so that circuit judges may run their courtrooms effectively and efficiently manage their dockets. Based on all the above, we are unable to find that the circuit court abused its discretion by refusing to allow Dr. Ducatman to testify about Dr. Phifer's report.

■ Mr. Jenkins next argues that Dr. Ducatman's testimony concerning the cause of his injury was sufficient even without any reference to Dr. Phifer's test results and therefore, the circuit court abused its discretion by refusing to allow the jury to consider his expert opinion. The circuit court concluded that because Dr. Ducatman could not "diagnose" Mr. Jenkins with toxic encephalopathy caused by exposure to solvents, the jury could not consider his testimony regarding Mr. Jenkins. Mr. Jenkins points out that while Dr. Ducatman stated that he could not "diagnose a causal relationship" without the neuropsychological report, he still gave strong statements regarding his injury. In particular, Dr. Ducatman testified that he was "convinced that Mr. Jenkins had a memory problem ... convinced he had very substantial solvent exposure ... convinced that he did not have other important risk factors other than solvent exposure." Mr. Jenkins argues that these opinions were sufficient evidence of causation under FELA and Rule 702 of the West Virginia Rules of Evidence [6] to be presented to the jury.

6. Rule 702 of the West Virginia Rules of Evidence states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

In response, CSX asserts that Dr. Ducatman's specific testimony about Mr. Jenkins was properly stricken because he could not testify that Mr. Jenkins' alleged memory problems were caused by occupational solvent exposure. CSX maintains that Dr. Ducatman's testimony that he was "convinced" that Mr. Jenkins had a memory problem and had been exposed to solvents was simply insufficient evidence of causation. Mr. Jenkins claimed he suffered from a specific medical disease, i.e., solvent-induced toxic encephalopathy, but Dr. Ducatman was unable to make that diagnosis. Thus, CSX reasons that Dr. Ducatman's testimony regarding Mr. Jenkins was properly excluded.

■ In *Gardner v. CSX Transportation, Inc.*, 201 W.Va. 490, 499, 498 S.E.2d 473, 482 (1997), this Court explained that plaintiffs who file FELA actions are required to "prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." (Citations omitted). Therefore, "[t]o prevail on a claim under The Federal Employers' Liability Act, 45 U.S.C. § 51 (1939), a plaintiff employee must establish that the defendant employer acted negligently and that such negligence contributed proximately, in whole or in part, to plaintiff's injury." Syllabus Point 6, *Gardner*. This Court has held that,

> "Medical testimony to be ... sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony ... sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant." Syllabus point 1, in part, *Pygman v. Helton,* 148 W.Va. 281, 134 S.E.2d 717 (1964).

issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Syllabus Point 2, *Sexton v. Grieco*, 216 W.Va. 714, 613 S.E.2d 81 (2005).

Having carefully reviewed Dr. Ducatman's testimony, we do not believe it warranted a reasonable inference by the jury that Mr. Jenkins suffered an injury that was proximately caused by the conduct of CSX. While Dr. Ducatman stated that he was convinced that Mr. Jenkins had memory problems, was exposed to solvents, and had no other risk factors, he also testified during cross-examination as follows:

Q: You've seen Mr. Jenkins one occasion, as you've testified, correct?

A: Yes.

Q: You did not diagnose a causal relationship between the exposure you set forth and his memory problem, correct?

A: That's right.

In light of the fact that Dr. Ducatman specifically stated that he could not make a diagnosis of toxic encephalopathy caused by exposure to solvents, we are unable find that the trial court abused its discretion in instructing the jury to disregard Dr. Ducatman's testimony regarding Mr. Jenkins.

▇ Finally, Mr. Jenkins contends that the circuit court erred by finding that Dr. Phifer's testimony regarding the cause of his injury was not sufficient to support his claim. In essence, Mr. Jenkins argues that a neuropsychological expert's testimony alone is sufficient to establish causation for a brain injury. He notes that in *Dolen v. St. Mary's Hospital of Huntington*, 203 W.Va. 181, 506 S.E.2d 624 (1998), this Court found that a dentist who was an oral surgeon but not a medical doctor was qualified to give an expert opinion in a medical malpractice case arising out of the defendant's failure to diagnose the plaintiff's broken jaw. Mr. Jenkins also points out that in *Akers v. Cabell Huntington Hosp., Inc.*, 215 W.Va. 346, 355, 599 S.E.2d 769, 778 (2004), a case involving psychological injuries that the plaintiff developed after being subjected to sexual harassment on the job, this Court stated that "the determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge; it does not

depend upon his claim to the title of psychologist or psychiatrist." (Citation omitted).

Mr. Jenkins maintains that Dr. Phifer's status as a neuropsychologist should have had no bearing on whether he could diagnose and give a causation opinion for Mr. Jenkins' medical injury. He contends that because the circuit court determined that Dr. Phifer possessed the requisite educational background and experience to qualify as an expert in clinical and forensic neuropsychology pursuant to Rule 702 of the West Virginia Rules of Evidence, his opinion concerning the cause of Mr. Jenkins' injury should have been given the same consideration in terms of admissibility as any other qualified expert, including a medical doctor, in the area of brain injuries.

In response, CSX argues that the circuit court did not abuse its discretion by prohibiting Dr. Phifer from testifying as to cause of Mr. Jenkins' injury. CSX states that contrary to the contention of Mr. Jenkins, the issue is not whether a neuropsychologist can qualify as an expert, but whether Dr. Phifer was qualified to render an opinion when he clearly admitted that he was not capable of doing so. CSX concludes that the court properly precluded Dr. Phifer from giving causation testimony because that was not his area of expertise.

▇ In Syllabus Point 5 of *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995), this Court held that,

In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

Having carefully review the record in this case, it is clear that the circuit court found that Dr. Phifer satisfied the first inquiry required by *Gentry*. However, the court

concluded that Dr. Phifer's area of expertise did not qualify him to give an opinion as to the cause of Mr. Jenkins' injury. The decision was based upon the following testimony elicited from Dr. Phifer by counsel for CSX:

Q: The point is, you make no medical diagnosis, correct?

A: I made a neuropsychological diagnosis.

Q: Yeah. And as Mr. Satterley [counsel for Mr. Jenkins] asked you, neuropsychology is an important component of a medical diagnosis of solvent-induced toxic encephalopathy, correct?

A: Yes.

Q: You must also have a companion medical diagnosis for the two to go together, is that right?

A: Well again, from a neuropsychological perspective, I can say it's consistent. But again that—we're stepping out of clinical things into forensic things.

I'm saying that in terms of the standard of proof necessary in a court of law, so I'm saying that's really not for me to decide whether something meets the standard of proof. I'm saying, from a clinical perspective, it was consistent, but that in and of itself may or may not meet the standard of proof.

Q: Your opinion is, from neuropsychology, you feel that he had the findings necessary for the neuropsychological component of this diagnosis to be satisfied, correct?

A: Yes, sir.

Q: You still must have the medical component, correct?

A: Well, I would, certainly would—I mean, what I said was I know of—I don't have the medical component—I know of no other competing hypothesis, but I don't have that medical component in the meantime.

Based upon this testimony, we find that the circuit court did not abuse its discretion by prohibiting Dr. Phifer from giving an expert opinion as to the cause of Mr. Jenkins' injury. Unlike the dentist in *Dolen* who we determined was qualified to give an expert opinion because his practice included diagnosing broken jaws and reading thousands of x-ray films, it is clear that Dr. Phifer was not qualified to give an expert opinion because he cannot make the medical determination necessary for a diagnosis of solvent-induced toxic encephalopathy. While we said in *Akers* that a psychologist could not be prohibited from giving psychiatric testimony simply because he or she did not have a medical degree, we emphasized that in order to be qualified to give the testimony, the expert must have the "background, training, and expertise." 215 W.Va. at 356, 599 S.E.2d at 779. Here, it is clear that Dr. Phifer was prohibited from giving a causation opinion at trial not because he was a neuropsychologist as opposed to a medical doctor, but because he acknowledged that he was not qualified to make the required diagnosis. Accordingly, the circuit court did not abuse its discretion in excluding the testimony of Dr. Phifer.

■■■ Having found that the circuit court did not abuse its discretion in limiting and excluding portions of the testimony of Dr. Ducatman and Dr. Phifer, we must affirm the circuit court's decision denying Mr. Jenkins a new trial. Absent evidence of causation, the circuit court's decision to grant CSX judgment as a matter of law was proper. *See* Syllabus Point 6, *Gardner, supra.* In reaching our decision today, we were, of course, mindful of the fact that under FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957).

This does not mean, however, that FELA plaintiffs need make no showing of causation. Nor does it mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible. It means only that in FELA cases the negligence of the defendant "need not be the sole cause or whole cause" of the plaintiff's injuries. *See Oglesby v. Southern Pacific Trans. Co.*, 6 F.3d 603, 608 (9th Cir.1993). FELA plaintiffs still must demonstrate some causal connection between a

defendant's negligence and their injuries. Id[.]

*Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 503 (9th Cir.1994). In Syllabus Point 2 of *Crookham v. New York Central Railroad Co.*, 144 W.Va. 196, 107 S.E.2d 516 (1959), this Court held that, "In an action prosecuted under [FELA], negligence of the defendant need not have been the sole proximate cause of the injury, but *the negligence of the defendant must have contributed to the cause of the injury in some degree.*" (Emphasis added). In this case, Mr. Jenkins was unable to provide sufficient evidence from which a jury could have determined that he suffered an injury that was caused in some degree by the conduct of CSX.

## IV.

## CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Ohio County entered on February 17, 2006, is affirmed.

Affirmed.

DAVIS, C.J., files a concurring opinion. STARCHER, J., files a dissenting opinion in which ALBRIGHT, J., joins.

DAVIS, C.J., concurring:

(Filed May 21, 2007)

In a mere matter of days, this Court has issued opinions in two strikingly similar cases. Both of these cases required expert testimony to provide causation evidence as to the plaintiffs' injuries. In both of these cases, the plaintiffs failed to supplement their expert disclosures, as required by West Virginia Rule of Civil Procedure 26(e)(1)(B), to alert the defendants as to the expanded scope of their experts' testimony. And in

both cases the circuit courts properly ruled in favor of the defendants, recognizing the plaintiffs' failure to so comply. However, in rendering a decision in these cases, the majority of this Court has not ruled consistently. In the case of *Estate of Fout–Iser ex rel. Fout–Iser v. Hahn*, 220 W. Va. 673, 649 S.E.2d 246 (2007), the majority of this Court reversed the circuit court's order essentially excusing the plaintiffs in that case from complying with the requirements of Rule 26(e)(1)(B); I dissented from that opinion. In the case *sub judice*, however, the majority has correctly affirmed the sanctions imposed upon the plaintiff by the circuit court.[1] Because the majority opinion in this case appreciates the importance of enforcing the West Virginia Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action,"[2] I concur.

STARCHER, J., dissenting:

(Filed June 29, 2007)

I dissent, because the majority opinion wrongly casts the plaintiff as being a recalcitrant who failed to diligently supplement his expert disclosures, as required by *West Virginia Rules of Civil Procedure*, Rule 26. The majority suggests that the defense was somehow surprised at trial by a novel new theory proffered by the plaintiff's expert and, in the interests of fairness and justice, the circuit court properly excluded the expert's testimony. This is simply not correct.

The record indicates that Dr. James Phifer, a neuropsychologist, examined the plaintiff and prepared an expert report of the plaintiff's brain injury. This report was made available to the defendant.

The plaintiff, pursuant to Rule 26, identified as his experts Dr. Phifer and Dr. Alan

1. That is not to say, however, that I necessarily would have chosen to impose the same sanctions upon the plaintiff had I been in the trial court's shoes. Be that as it may, a trial court has discretion to impose sanctions for discovery violations, and, absent an abuse of such discretion, the trial court's ruling must stand. *See* W. Va. R. Civ. P. 37 (authorizing trial court to impose sanctions for "[f]ailure to cooperate in discovery"); Syl. pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995)

("[T]he West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making … procedural rulings. Thus, rulings on … the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review … procedural rulings of the circuit court under an abuse of discretion standard.").

2. W. Va. R. Civ. P. 1.

M. Ducatman. The Rule 26 disclosure of experts made it clear that Dr. Ducatman would be relying on any and all medical records made available to him, which would include Dr. Phifer's expert report.

This was not the first case tried by plaintiff's counsel or defendant's counsel regarding brain injuries to railroad employees caused by exposure to solvents on the job. In past solvent cases, defense counsel had taken discovery depositions of Dr. Ducatman, and in each instance about five minutes worth of questions were asked regarding the doctor's review and reliance upon another expert's neuropsychological testing report.

At Dr. Ducatman's deposition in the plaintiff's case, counsel for the defendant—like in past cases—asked Dr. Ducatman about Dr. Phifer's neuropsychological report. Dr. Ducatman, however, indicated he had misplaced Dr. Phifer's report and was unable to comment upon it. Counsel for the defendant therefore reserved the right to conduct a follow-up deposition of Dr. Ducatman, and counsel for the plaintiff agreed.

Following the deposition, Dr. Ducatman reviewed Dr. Phifer's report. Counsel for the plaintiff did not advise counsel for the defendant that the doctor had read the neuropsychological report, reasoning that (a) the Rule 26 disclosures already indicated Dr. Ducatman would be relying on all the plaintiff's medical records, like Dr. Phifer's report that was given to the defendants; (b) the defendant had taken Dr. Ducatman's discovery deposition, in part, to ask about his reliance on Dr. Phifer's report; and (c) in past cases, counsel for the defendant routinely asked questions about Dr. Ducatman's reliance upon neuropsychological testing of the plaintiff to form his opinion.

Furthermore, the defendant knew that Dr. Ducatman would be testifying about the causal connection between solvent exposure and the plaintiff's neuropsychological injury. Yet, prior to trial, the defendant never filed a motion *in limine* to preclude any portion of Dr. Ducatman's testimony as lacking a basis, or because the plaintiff had failed to make any supplemental disclosures.

At trial, Dr. Ducatman testified about the general science involving the connection between exposure to solvents and injuries of the brain. It was only when the doctor proceeded to address the plaintiff's specific neuropsychological injuries, and connect those injuries with his solvent exposure, that the defendant objected that it had not been given an opportunity to depose the doctor regarding his review of Dr. Phifer's report. The circuit court sustained the objection, and prevented Dr. Ducatman from testifying about the connection between the plaintiff's injury and his on-the-job exposure to solvents. And because Dr. Phifer was only qualified to say that the plaintiff had an injury, the end result was that the circuit court dismissed the plaintiff's case for lacking evidence of causation.

On these facts, it is clear that the defendant knew of the existence of Dr. Phifer's report, and knew that Dr. Ducatman would be relying upon that report. There was no surprise, and there was no intentional, calculated, egregious failure by the plaintiff to comply with Rule 26, as the majority opinion would have us believe.

The *Rules of Civil Procedure* are designed to achieve a speedy and just resolution. *See* Rule 1. The circuit court said that "[i]f this was going to be a month, month and a half trial … I would have you redepose Dr. Ducatman … I've done that many times during a trial. But they're lengthy trials. We cannot—I just—we don't have the time to do that now, and that's unfortunate." But there is nothing in the record showing the circuit court asked the parties, "how long will it take to ask Dr. Ducatman about his review of Dr. Phifer's report?" In past cases, by the plaintiff's calculation, such questioning lasted about five minutes. Had the trial court allowed questioning of Dr. Ducatman by defense counsel out of the presence of the jury, in a matter of minutes the defendant's questions about the doctor's opinion regarding Dr. Phifer's report would have been answered. Justice would have been served, because the plaintiff and the defendant would have been permitted to lay out the entirety

of their evidence before the jury for a fair and final resolution.

Instead, it is my firm belief that the trial court abused its discretion, and prematurely short-circuited this case by excluding evidence crucial to the plaintiff's cause. I therefore dissent.

I am authorized to state that Justice ALBRIGHT joins in this dissent.